**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 99-30309
_____

MISTY HECK,

Plaintiff-Appellant,

versus

TIME INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
(95-CV-629-A-M1)

_____

May 16, 2000

Before WIENER, BENAVIDES, and PARKER, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Misty Heck appeals from the adverse judgment of the district court, grounded in a jury verdict, agreeing with the contention of Defendant-Appellee Time Insurance Company ("Time") that Heck's infant daughter, Sommer, had a pre-existing medical condition within the meaning of the health insurance policy issued by Time ("the Policy") that voided coverage. We perceive no reversible error in the court's jury instructions and interrogatories — to which neither party timely objected — and we agree with the district court's conclusion that

---

[*] Pursuant to 5TH CIR. Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. Rule 47.5.4.

1

sufficient evidence was adduced on which a reasonable jury could find that, prior to the effective date of the Policy —— 12:01 a.m., December 23, 1994 —— Sommer exhibited "signs or symptoms [that] should have caused an ordinarily prudent person to seek diagnosis or treatment," thereby making her "signs or symptoms... significant enough to establish manifestation" of her disease before the Policy was effective and thereby constitute a pre-existing condition.  We therefore affirm.

Time has never intimated, much less asserted, that Heck or any other family member acted in bad faith in obtaining insurance from Time in such close proximity to the diagnosis of little Sommer's fatal neuroblastoma.  Rather, Time has maintained at all times that observations of objective physical conditions of the child's abdomen by a family member and a caregiver were such that a layman of ordinary prudence would have been prompted to seek diagnosis or treatment.  This is not to be confused with prompting a prudent layman to suspect that Sommer was suffering from neuroblastoma, or from some other form of cancer, or for that matter from any specific disease or adverse medical condition whatsoever; only that her symptoms were such that a prudent layman's concern should have been piqued sufficiently to prompt the seeking of professional diagnosis or treatment for whatever malady might be producing these symptoms.

In excluding coverage of a pre-existing sickness or injury, the Policy defines sickness as "[a]n illness, disease or condition which first manifests itself while this policy is in force."  The

Policy goes on to state expressly what that definition implies, i.e., that pre-existing conditions are not covered, and to define a pre-existing condition as:

> [a] sickness, injury, disease or physical condition:
>
> 1. For which the Covered Person received medical treatment or advice from a Physician within the five year period immediately preceding the Effective Date of Coverage;
>
> 2. which produced signs or symptoms within the five year period immediately preceding the Effective Date of Coverage.

The policy then establishes "manifestation or onset" as the threshold for signs and symptoms to be cognizable:

> The signs or symptoms must have been significant enough to establish manifestation or onset....

And the policy established a two-part, disjunctive test for determining if signs or symptoms are sufficiently significant to constitute manifestation or onset:

> a. The signs or symptoms would have allowed one learned in medicine to make a diagnosis of the disorder; or
>
> b. The signs or symptoms should have caused an ordinarily prudent person to seek diagnosis or treatment.

Time insists that signs or symptoms of Sommer's sickness or disease for which it is denying coverage — her neuroblastoma — were sufficient to manifest her condition before the December 23, 1994 effective date of the Policy. On appeal, Time does not stress that these signs or symptoms were significant enough, prior to coverage, to allow "one learned in medicine" to diagnose Sommer's

3

cancer. Rather, Time supports the jury's determination that those signs and symptoms were sufficiently significant to establish manifestation or onset under the second, "ordinarily prudent person" prong of the disjunctive test contained in the Policy. Time observes that, unlike the first, "one learned in medicine" prong, this second prong is not disease-specific — and properly so. Under this prong, a layman need only observe an abnormal condition that should prompt him to seek diagnosis or treatment; he need not know or even have any clue as to the identity of the sickness or illness that is causing those signs or symptoms.

Although an element of confusion might have been generated by Sommer's temporally coincident symptoms of an ear infection and her pre-coverage examination and treatment for that condition during the period preceding her diagnosis of neuroblastoma, we find no indication in the record that the jury was confused or misled by the simultaneous presence of these unrelated illnesses. We are satisfied that the jury focused on the key question of this appeal, whether the evidence of the palpable and visible condition of Sommer's abdomen as observed by laymen prior to December 23, 1994, was such that the hypothetical "ordinarily prudent person" — being neither an hysterical, overreacting person nor an overly blase or unduly indifferent person — would be prompted to have that child examined by a health care professional for whatever might be causing those signs or symptoms.

The following evidence of lay observations of Sommer's "signs or symptoms" was presented to the jury: (1) At a Christmas party

on December 10, 1994, Heck's stepmother noticed that Sommer's "little tummy was hard," mentioned it to her husband (Heck's father), and suggested that the child's stomach be checked; but also testified that she thought Sommer "might have gas" and did not think it was "that big of a deal"; (2) on December 21st, Sommer's regular caregiver at her childcare center noticed that Sommer's abdomen was "a little swollen" and hard, but speculated that the child might be constipated; (3) the next day, that same caregiver observed that Sommer's abdomen was still swollen and hard but did not appear to be getting larger, observing that the child otherwise appeared to be fine. The jury also heard testimony in mitigation of the sufficiency of such signs or symptoms to prompt the seeking of medical attention: (1) Neither Heck's stepmother nor the daycare worker were sufficiently alarmed to relate their observations to Sommer's parents; (2) the daycare worker testified that Sommer's usual pattern of bowel movements was such that the worker assumed the child's hard and swollen abdomen was symptomatic of constipation; and (3) the physician who eventually diagnosed Sommer's malignancy stated that "a swollen belly would be an appropriate presentation" of a neuroblastoma in the abdomen, but added that "the common swelling in a baby's belly is one in which they are full of poo rather than full of tumor."[1]

---

[1] The jury also heard evidence that on December 18, 1994 — a week after the stepgrandmother noticed the hard tummy and suggested that it be checked and three or four days before the daycare worker noticed that Sommer's abdomen was swollen and hard — Sommer was observed by her parents to have a high fever and repeatedly pull at her ears, prompting Heck to seek diagnosis and treatment.

At different stages of the two day trial, each party moved for a judgment as a matter of law and, within ten days following the entry of judgment, Heck renewed her motion and, in the alternative, requested a new trial. The district court denied all these motions and filed a written opinion in which it concluded that the jury was entitled to infer from the evidence that Sommer's objective signs and symptoms of abdominal problems were sufficiently significant to cause an ordinarily prudent person to seek professional attention. We agree with the trial court's assessment.

This appeal presents a quintessential question of fact for jury determination. The coverage denied by Time was that for medical costs and expenses arising from or connected with Sommer's abdominal neuroblastoma. The pre-December 23rd signs and symptoms relied on by Time are those directly related to Sommer's abdomen, and are the ones considered by the jury. This presented the jury with a straightforward choice: Either (1) agree with Heck that the tight and swollen abdomen observed by her stepmother on December 10 and by the daycare worker on December 21st and 22nd was the kind of

Antibiotics were prescribed by phone and Sommer was seen by the family physician during his rounds at the hospital the next day, at which time he confirmed the diagnosis of ear infection from which, in the opinion of her parents, she recovered after taking the antibiotics. Time does not base its denial of coverage on the symptoms of ear infection and, as noted above, nothing in the record suggests that the jury was confused by that ear infection evidence or considered its signs or symptoms in responding affirmatively to jury interrogatory number 3, "[d]o you find that Sommer had signs or symptoms prior to December 23, 1994, which should have caused an ordinary person to seek diagnosis or treatment?" The ear incident came and went routinely during the hiatus of several days between December 10 and 21, while the abdomen situation was quiescent, at least as far as the record of this case is concerned.

condition that persons who care for infants encounter routinely and not the kind that should prompt one to resort to healthcare professionals for diagnosis and treatment, or (2) agree with Time that an ordinarily prudent person should indeed be prompted to seek diagnosis or treatment on observing such signs or symptoms in a child. The jury deliberated and, in the end, agreed with Time.

If presented with the same factual determination, we might not reach the same conclusion as did the jury. As the evidence of the signs and symptoms presented to the jury was more than a mere scintilla, however, we are prohibited from substituting our opinion, based on a cold record, for that of the jurors who heard the testimony and observed the witnesses —— as did the trial judge, who declined Heck's invitation, both before and after verdict, to grant her motion for a judgment as a matter of law or a new trial.

Finding no reversible error in the conduct of the jury trial of this case or in the rulings of the district court, the judgment of that court is, in all respects,

AFFIRMED.